In accordance with the directives of the North Carolina Court of Appeals, The Full Commission finds as fact and concludes as matters of law the following which were entered into by the parties in the Pre-trial Agreement and at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. All parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act and Fireman's Fund Insurance Company is the administrator for Abbott Laboratories, Self-insured.
2. The employee contracted an occupational disease, bilateral carpal tunnel syndrome, arising out of and in the course of employment on 21 September 1992.
3. The average weekly wage of the employee, including overtime and all allowances is $340.00.
4. The employer paid compensation to the employee at the rate of $226.25 per week for the period beginning 8 March 1993 and continuing through 21 June 1993 pursuant to the Agreement for Compensation for Disability (I.C. Form 21) entered into by the parties on 16 March 1993.
5. All I.C. forms previously filed in this action are stipulated as evidence.
6. The parties further stipulate that the only issue before the Commission is to what benefits, if any, is the plaintiff entitled under the North Carolina Workers' Compensation Act after 21 June 1993.
 ***********
In accordance with the directives of the North Carolina Court of Appeals and based on the competent, credible evidence of record, the Full Commission adopts the findings of fact of the deputy commissioner with minor modifications and finds as follows:
 FINDINGS OF FACT
1. At the time of hearing before the Deputy Commissioner, plaintiff was 48 years old and had a high school diploma. She was hired by Abbott Laboratories on 4 April 1976, where she worked as a production operator until 21 June 1993.
2. Around 15 May 1991, plaintiff experienced pain and numbness in both hands, but more prominently in the right hand. Dr. Margaret Sowerwine, Abbott's company doctor, started treating her at that time with ibuprofen and splints on her hands. Over the next year, plaintiff occasionally returned to Dr. Sowerwine with complaints of bi-lateral wrist pain.
3. On 21 September 1992, plaintiff's bilateral wrist pain had become more pronounced and was not responding to conservative treatment. Dr. Sowerwine ordered a second NCV test, which was done on 18 February 1993. The test revealed that plaintiff had a significant delay of the right distal latency for the right median sensory nerves. She also had significant delay in all sensory components for the right median sensory nerve. The diagnosis was right carpal tunnel syndrome. Dr. Sowerwine noted that plaintiff had a right median motor distal latency of 6.88 which was past the point that Abbott's employees were normally referred for surgery.
4. Dr. Sowerwine arranged an appointment for plaintiff with Dr. J. Greg Nelson, an orthopedic surgeon, for 8 March 1993. The referral was made for Dr. Nelson to perform a right hand carpal tunnel release for plaintiff. Dr. Nelson injected the right carpal tunnel with Aristocort and Marcaine rather than proceeding with surgery. On follow-up plaintiff's wrist symptoms were not improved. On 19 March 1993, Dr. Sowerwine decided that Dr. Nelson was going to do the right carpal tunnel release, or she was going to send plaintiff to another surgeon. Dr. Nelson did the surgery on 30 March 1993.
5. At post-operative follow up on 2 April 1993, plaintiff had no pain on flexion or extension of her right hand, less numbness and negative Tinel's and Phalen's signs. However, her left wrist was extremely painful. Dr. Nelson injected the left wrist with Triamcinolone and Marcaine and referred plaintiff to Nash Day Hospital Physical Therapy for fluidotherapy. When plaintiff returned to Dr. Nelson on 22 April 1993, her left wrist was still painful. Dr. Nelson summarily dismissed her complaints of left hand pain saying that his examination, x-rays, EMG and nerve conduction tests revealed no abnormality in her left hand.
6. After examining plaintiff on 22 April 1993, Dr. Nelson recommended that she participate in a work hardening program for 2 — 3 weeks and then return to her normal work duties. When Nash Day Hospital Physical Therapy received the prescription for work hardening, the therapist recommended postponement of right hand therapy for two weeks so that the surgical incision could heal. Dr. Nelson looked at the incision and said it was primarily healed without evidence of dehiscence.
7. Plaintiff attempted physical therapy; however, on 13 May 1993, Nash Day Hospital Physical Therapy reported that plaintiff was "dying of right arm, as well as left arm pain . . . and it would be pointless to restart work hardening." Dr. Nelson discussed plaintiff's progress with an occupational therapist on 14 May 1993, and was told that the therapist could not work with plaintiff because of her pain. Dr. Nelson discontinued the physical therapy. Dr. Nelson was of the opinion that plaintiff might be suffering from reflex sympathetic dystrophy. He sent her to Nash Day Hospital for a cervical ganglion block, which provided relief for only about an hour.
8. On 21 May 1993, Dr. Nelson wrote a letter, releasing himself as treating physician for plaintiff. In the letter, he concurred with Dr. Sowerwine's proposed treatment plan of 13 May 1993 which recommended that plaintiff continue with tricyclics and passive physical therapy, and that she be referred to a psychologist. Dr. Nelson persisted in his opinion that the plaintiff should return to her normal work activities without restrictions.
9. Beginning on 13 May 1993, Dr. Sowerwine assumed sole responsibility for plaintiff's treatment. She disagreed with Dr. Nelson's opinion that plaintiff was capable of returning to full work duties, without restrictions. Dr. Sowerwine continued plaintiff on physical therapy and tricyclics. Dr. Sowerwine was convinced that there was a psychological component to plaintiff's pain, so she referred her to Deborah Burnett, the company psychologist, and made an appointment for plaintiff to see Samuel J. Moon, M.D., at Duke Hospital, on 29 June 1993. Dr. Moon is a professor of family medicine who, through practice and experience, has become a specialist in hand problems and industrial problems causing disability.
10. On 10 June 1993, Dr. Sowerwine felt pressured by defendant to send plaintiff back to work, because there were no significant physical findings to explain her pain, and Abbott Laboratories was aware that Dr. Nelson had released plaintiff to return to work. Dr. Sowerwine was familiar with production line work and knew that the speed and demands of the work are controlled collectively by the line workers. The "line" cannot accommodate the physical disabilities of an injured employee. Nevertheless, on 11 June 1993, Dr. Sowerwine modified Dr. Nelson's return to work with no restrictions by limiting plaintiff to four hours per day for two weeks.
11. Plaintiff returned to work on Monday, 14 June 1993. She worked for about an hour, then reported to Employee Health with a burning pain and swelling over the radial volar wrist on both sides. Dr. Sowerwine sent plaintiff home with instructions to take Elavil and soak her hands in cold water every one to two hours for the remainder of the day. Dr. Sowerwine closed her note of 14 June 1993, by writing, "If plaintiff cannot tolerate more that an hour by the end of the week, then we'll give up, but at least we'll have some extra information for Dr. Moon."
12. On Tuesday, 15 June 1993, plaintiff worked from 6:30 to 7:00 am, and experienced burning pain in both hands and arms up to the elbow. She received heat treatment at Employee Health and was examined by Dr. Sowerwine, who released her from work for the day. Dr. Sowerwine told plaintiff that she would not be in her office on Wednesday and Thursday, and to work as long as she could tolerate the pain and go home. On Friday, 18 June 1993, plaintiff was unable to work for more than an hour and was released from work by Dr. Sowerwine.
13. On Monday, 21 June 1993, plaintiff did not think that she could continue stacking bags because it was causing her so much pain. She went to "personnel" and asked if she could be placed in overwrap. This was an inspection job and did not require her to use her hands. Although the conversation between plaintiff and the personnel manager is controverted, the Full Commission affirms the deputy commissioner's findings of fact concerning what transpired between plaintiff and the personnel manager. Plaintiff was told by the personnel manager that there were no jobs available in overwrap and if she could not stack bags, defendant-employer had no work for her. The personnel manager also told plaintiff that she would have to be escorted from the premises by the security guard and that she would be notified about liquidating her Abbott stock. Plaintiff did not "quit" her job. She thought she might have been "fired," because she was escorted to the door.
14. It is undisputed that defendant-employer terminated plaintiff's temporary partial disability and medical benefits and filed a Form 28 with the Industrial Commission with a hand-written notation, "*Quit 6/21/93, Stop W.C. coverage." Defendant-employer did not apply for approval from the Industrial Commission to terminate plaintiff's workers' compensation benefits, and plaintiff had not reached maximum medical improvement at this time.
15. On 6 July 1993, the parties signed a Form 26 Supplemental Memorandum of Agreement as to Payment of Compensation," in which defendant agreed to pay plaintiff temporary partial disability compensation at the weekly rate of $113.50, beginning on 14 June 1993 and continuing for a period of "two weeks." The Form 26 supplemental agreement is the process defendant was required by the Commission to follow in this case because there was an additional payment of compensation after approval of the Form 21 agreement and plaintiff's entitlement to temporary total disability compensation had ended after her return to part time work at reduced wages. This case predates the trial return to work statute. On the Form 26 defendant agreed to pay plaintiff partial disability for the "two week" period that Dr. Sowerwine had returned her to work at four hours per day. However, the wage rate recited on the Form 26 was inaccurate as plaintiff never worked more than an hour each day between 14 June 1993 and 18 June 1993, and for less than four hours on 21 June 1993. At the time defendant filed the Form 26 with the Industrial Commission, defendant knew that the wage rate recited as earned by plaintiff was incorrect. It is not clear from the evidence the date plaintiff actually signed the Form 26, although the date of the agreement is stated as 6 July 1993.
16. On 7 July 1993, plaintiff went to J. Th. Bloem, M.D., orthopedist, for another medical opinion. Dr. Bloem diagnosed plaintiff as suffering from bilateral carpal tunnel syndrome. Defendant-employer would not authorize Dr. Bloem's request for new blood work or x-rays. Without an authorization for treatment, Dr. Bloem would not assume the responsibility of treating plaintiff.
17. In March 1994, plaintiff managed to get an appointment with Robert J. Spinner, M.D., in the Orthopaedics Department of Duke Medial Center. After examining plaintiff, Dr. Spinner made a preliminary diagnosis of bilateral reflex sympathetic dystrophy. He further made a request to the Neurology Department for EMG and nerve conduction studies and started plaintiff on Procardia 10mg.
18. Nerve conduction testing demonstrated electrophysical evidence of mild right carpal tunnel syndrome. There was no evidence of left carpal tunnel syndrome or right cervical radiculopathy. On follow-up in the Orthopaedics Department, plaintiff was described as suffering from diffuse and disabling pain, worse in the right hand. The EMG/NCS tests showed no conclusive deficit to explain the diffuse pain described by plaintiff in her neck and both hands and arms.
19. Plaintiff's symptoms suggested that she might be suffering from fibromyalgia. Therefore, she was referred to John. S. Sundy, M.D., a rheumatologist. Dr. Sundy diagnosed plaintiff as suffering from fibromyalgia with muscle spasms, carpal tunnel syndrome, sleep disorder and depression. The carpal tunnel syndrome, fibromyalgia and depression were interrelated. According to Dr. Sundy, having to cope with her wrist and arm pain, sleeplessness and fibromyalgia was causing plaintiff to be depressed. The depression, in turn, was aggravating and amplifying symptoms of the carpal tunnel syndrome and fibromyalgia.
20. Dr. Sundy was of the opinion that the immediate goal in the treatment of plaintiff was to address the depression. He referred her to David F. Naftolowitz, M.D., in the Psychiatric Department. Dr. Naftolowitz diagnosed plaintiff as suffering from a somatoform pain disorder. Patients with this disorder have a psychological component that causes them to magnify pain. They feel and describe greater pain than one would expect, given their physical problems. Somatoform disorders originate in the subconscious and are not the result of a conscious thought process.
21. Plaintiff's admittedly compensable carpal tunnel syndrome caused her to suffer chronic hand and wrist pain. This pain has developed into a chronic pain syndrome, which is made worse by somatoform disorder. Because of her continuous pain and her inability to work, plaintiff developed and suffers from major depression. Plaintiff's depression is a direct and natural consequence of her carpal tunnel syndrome and resulting chronic pain syndrome.
22. Defendant-employer admitted that plaintiff contracted an occupational disease, bilateral carpal tunnel syndrome, on a Form 21 Agreement for Compensation, dated 16 March 1993. On 21 June 1993, while plaintiff was attempting to return to restricted work and before she had regained her pre-injury wage earning capacity, defendant-employer terminated her employment and her temporary partial disability and medical compensation.
23. At the time of the hearing before the Deputy Commissioner, plaintiff had not reached maximum medical improvement.
24. Plaintiff filed a Form 33 to reinstate workers' compensation benefits after 21 June 1993. Defendant filed a Form 33R, denying that any benefits were owed to plaintiff on the ground that she had unjustifiably refused suitable employment.
25. Plaintiff's attempt to return to work on 14 June 1993 was unsuccessful due to disabling pain associated with her admittedly compensable occupational disease. Defendant's offer of employment was not suitable to plaintiff's medical condition and physical limitations caused by her occupational disease; therefore, plaintiff did not unjustifiably refuse suitable employment when she tried but could not work. Since defendant fired plaintiff on 21 June 1993, her failure to return to work with defendant thereafter does not constitute a refusal of suitable or unsuitable employment.
26. Plaintiff has proven by the greater weight of the evidence that she has been incapable of working and earning wages as a result of her carpal tunnel syndrome, chronic pain and depression since 21 June 1993.
27. The Court of Appeals found that the presumption of plaintiff's continuing disability which was created by the Form 21 Agreement was waived by plaintiff's acceptance of the Form 26 Supplemental Agreement as to Payment of Compensation of 6 July 1993, which covered plaintiff's partial disability status beginning on 14 June 1993 and continuing for "two weeks." However, plaintiff reestablished her continuing disability subsequent to the time limits contained in the Form 26 by presenting evidence which shows that she was unable, as a result of her carpal tunnel syndrome and chronic pain syndrome to perform the work in her pre-injury job or any of the other positions assigned to her upon her return to work.
28. Plaintiff is entitled to reinstatement of her temporary total disability compensation after 28 June 1993.
29. Plaintiff also filed an alternative claim for change of condition which the Full Commission is not addressing. Since all of the compensable consequences of plaintiff's occupational disease have not been paid, this is not a change of condition case.
 ***********
In accordance with the directives of the North Carolina Court of Appeals and based on the foregoing stipulations and findings of fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. Defendant admitted liability for plaintiff's bilateral carpal tunnel syndrome by signing the Industrial Commission Form 21 Agreement for Compensation for Disability. Once defendant-employer accepted plaintiff's occupational disease as compensable on a Form 21, there was a presumption that her disability continued until she returned to work at wages equal to those she was receiving at the time her injury occurred.Watkins v. Motor Lines, 279 N.C. 132, 137, 181 S.E.2d 588, 592 (1971).Kisiah v. W.R. Kisiah Plumbing, Inc., 124 N.C. App. 72, 476 S.E.2d 434
(1996).
2. Plaintiff's presumption of continuing disability was "waived" by the Form 26 Supplemental Agreement for Payment of Compensation on 6 July 1993, which covered partial disability from 14 June 1993 to 28 June 1993. See Dancy v. Abbott Laboratories, 139 N.C. App. 533, 534 S.E.2d 247
(2000).
3. Plaintiff reestablished her continuing total disability following 28 June 1993, through medical evidence which shows that due to her carpal tunnel syndrome, chronic pain syndrome and resulting depression she is unable to return to work. Until defendant proves plaintiff is employable, or no longer disabled, it must pay workers' compensation benefits to her. Franklin v. Broyhill Furniture Industries,123 N.C. App. 200, 206, 472 S.E.2d 382, 388 (1996).
4. In order to prove that plaintiff is capable of earning pre-injury wages, defendant must produce evidence that suitable jobs are available to plaintiff and that she is capable of getting one, taking into account her physical and vocational limitations. A job is suitable if the employee is capable of performing it given her age, education, physical limitations, vocational skills, and experience. Franklin, at p. 206.
5. Plaintiff was unable to perform the job duties assigned upon her return to work. The job offered was not suitable to plaintiff's medical condition and physical limitations resulting from her compensable occupational disease. Therefore, plaintiff did not unjustifiably refuse suitable employment when she was incapable of performing the job duties assigned upon her return to work. Plaintiff's failure to work after her firing on 21 June 1993 did not constitute a refusal of suitable employment.
6. Plaintiff's depression is a direct and natural consequence of her compensable injury. If an employee receives an injury which is compensable and the injury causes her to become so emotionally disturbed (and severely depressed) that she is unable to work; she is entitled to compensation for total incapacity under N.C.G.S. § 97-29. Fayne v.Fieldcrest Mills, Inc., 54 N.C. App. 144, 146, 282 S.E.2d 539 (1981).
7. Plaintiff is unable to work due to her admittedly compensable bilateral carpal tunnel syndrome, chronic pain syndrome and her depression.
8. Plaintiff will likely need vocational rehabilitation to assist in her efforts to return to work.
 ***********
In accordance with the directives of the North Carolina Court of Appeals, Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following
 AWARD
1. Defendants shall pay temporary total disability benefits to plaintiff at the compensation rate of $226.95 per week from 28 June 1993 and continuing until further order of the Commission. Defendant is given a credit for compensation paid to plaintiff after defendant resumed paying plaintiff temporary total disability benefits pursuant to the Commission's Order dated 17 October 1996. That compensation which has accrued shall be paid to plaintiff in a lump sum.
2. Defendants shall pay all medical expenses incurred or to be incurred in the future by plaintiff as a result of her compensable injury when bills for same have been submitted and approved through procedures adopted by the Commission.
3. An attorney's fee in the amount of 25% of this Award is hereby approved for plaintiff's counsel payable as follows: Twenty-five percent of the Award which has accrued shall be deducted and sent to plaintiff's counsel; additionally, every fourth check due plaintiff shall be sent directly to plaintiff's counsel.
4. Defendants shall pay the cost due the Commission.
This the ___ day of August, 2001.
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER
 S/______________ RENE C. RIGGSBEE COMMISSIONER